# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SUMMIT FINANCIAL RESOURCES, L.P., | |
| Plaintiff, | |
| v. | CIVIL ACTION |
| | No. 08-2145-CM |
| KATHY'S GENERAL STORE, INC., | |
| Defendant. | |

## MEMORANDUM AND ORDER

Plaintiff Summit Financial Resources, L.P. ("Summit") brings this action against defendant Kathy's General Store, Inc. ("Kathy's"). Summit claims that defendant failed to remit payment on accounts receivable that Summit purchased from Kathy's fuel suppliers, Walthers Inc. and Walthers Oil Company (together "Walthers Oil"). Kathy's has asserted a counterclaim against Summit for conversion, claiming that Summit improperly received and retained amounts, totaling $148,275.85.[1] from Walthers Oil that were inadvertently paid to Walthers Oil by Kathy's.

This court held a bench trial on November 3, 2009. The parties completed post-trial briefing, and the court has reviewed the briefs the parties submitted. The court is now prepared to issue its findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

### Findings of Fact

1. Kathy's is a combination service station, convenience store, and clothing/gift shop that has operated in Holton, Kansas for over twenty years.

2. Walthers Oil was a motor fuel distributor.

---

[1] At trial, Kathy's reduced its claim to $63,715.70.

-1-

3. Summit is a commercial lender who advances money against its clients' accounts receivables, asset based lending, or actually purchased the accounts receivable of the client, factoring.

4. Walthers Oil sold fuel to Kathy's, among others, from 1989 through December 13, 2007.

5. During the time Kathy's received motor fuel from Walthers Oil, the fuel was usually prepaid.

6. Kathy's received a one percent discount on its fuel for using the prepaid method.

7. Beginning in April or May 2007, Kathy's used Petroleum Card Services ("PCS") to deposit proceeds from credit cards sales into Walthers Oil's bank account, the proceeds were for pre-payment for fuel.

8. Kathy's maintained a credit balance with Walthers Oil by virtue of credit card proceeds that were deposited into the Walthers Oil bank account for all credit card sales at the retail outlet, which included sales from clothing, gifts, jewelry, cigarettes, and motor fuel. The credit balance was carried over from month to month.

9. Upon delivering a load of fuel to Kathy's, Walthers Oil generated an invoice and calculated the amount to be offset against the credit card balance on hand in the Walthers Oil account.

10. Kathy's did not get bills from Walthers Oil. Instead, someone from Kathy's and Walthers Oil would compare spreadsheets once a month to determine the balance of the account.

11. When the credit card receipts were larger than the amount due for the fuel, Walthers Oil would send Kathy's a check for the balance or keep the money as a credit toward the next fuel delivery.

12. Kathy's had maintained a credit balance in Walthers Oil's account for a period of at least five years prior to December of 2007.

13. On or about June 21, 2007, Summit entered into two financing agreements, one with Walthers Oil Company and one with Walthers Inc. (collectively referred to as the "Walthers Financing Agreements").

14. Summit reviews the history of client's accounts and a number of different items to determine what accounts to purchase.

15. Summit hired an examiner to review accounts at Walthers Oil and write a report to Summit prior to engaging in the financing agreements with Walthers Oil.

16. Prior to entering into the financing agreements, Summit was aware that some accounts were paid by credit card proceeds.

17. Pursuant to the financing agreement with Walthers Inc., Summit purchased accounts receivable from Walthers Oil and made advances to Walthers Oil beginning in June 2007.

18. Summit took a security interest in all of Walthers, Inc. collateral, that is, its accounts receivables.

19. The UCC financing statement for Walthers Oil describes the scope of the security interest covering all of the assets of Walthers Oil.

20. Section 13(a) of the financing agreements required Walthers Oil to mail an invoice to each account debtor and to stamp or write on the invoice that the account was payable to Summit.

21. Section 13(e) of the financing agreements required that Walthers Oil, upon inquiry or request, notify the account debtor to make payment directly to Summit.

22. Under Section 14 of the financing agreements, an account had to meet the following criteria before Summit would purchase it: (1) Walthers Oil must have the sole and unconditional good title to the account and (2) the account had to be a bona fide obligation of the account debtor for the amount identified by Walthers Oil and no payments, deductions, credits or other modifications could have been made to the account.

23. At least weekly, and sometimes a couple of times a week, Walthers Oil would submit a list of accounts for purchase to Summit, Walthers Oil represented the accounts were owing to Walthers Oil.

24. Trial Exhibit 5 is the purchase report detailing the Kathy's accounts Summit purchased from Walthers Oil.

25. Walthers Oil represented the accounts of Kathy's were due and owing when it submitted the accounts to Summit for purchase, and Summit relied on the representation of Walthers Oil.

26. In order to provide Kathy's with notice that Walthers Oil had entered into the Walthers Financing Agreements with Summit and that Kathy's accounts had been assigned to Summit, Walthers Oil sent, by certified mail, an authenticated Notice of Assignment ("NOA") to Kathy's.

27. Kathy's received the NOA on July 30, 2007.

28. The NOA notified Kathy's that the terms of the Walthers Financing Agreements "require[d] that payments on accounts receivable be made to Summit Financial Resources, L.P.," and directed Kathy's "to make payment of all accounts receivable and all other amounts owing to Walthers, Inc. directly to Summit Financial Resources, L.P.," providing an address where all payments should be sent.

29. The NOA instructed Kathy's to direct any questions in connection with the NOA to Summit, and provided a telephone number where inquiries could be directed and further correspondence could be sent.

30. The NOA also stated that the instruction to direct payment to Summit as set forth in the NOA "may be changed or terminated only by written notice signed by Summit Financial Resources, L.P."

31. Walthers Oil did not direct its customers to send the payments to Summit prior to receipt of the NOA.

32. Kathy's did not make or direct the payment of any amounts to Summit after receiving the NOA. Instead, Kathy's contacted Walthers Oil after receiving the NOA and was told by Walthers Oil to

disregard the NOA and to continue making payments directly to Walthers Oil. Kathy's did not seek advice from an attorney regarding its legal obligations arising out of the NOA.

33. Kathy's disregarded the NOA and continued to make payments to Walthers Oil through the PCS credit card processing equipment.

34. Kathy's never contacted PCS in response to the NOA to instruct PCS to make payment to Summit, nor did it attempt to contact Summit regarding the NOA.

35. After receiving the NOA on July 30, 2007, Kathy's continued to prepay Walthers Oil for fuel sales and deliveries through the PSC credit card system.

36. Kathy's has not paid Summit any money.

37. Walthers Oil was 100% in default in submitting payments to Summit.

38. On August 28, 2007, Walthers Oil received notice of default under the financing agreements.

39. Summit called Kathy's on August 8, 2007, and left a message for Janice in accounts payable to call back.

40. Summit called Kathy's on October 2, 2007, and again left a message for a call back and indicated Summit would call again on October 3, 2007. No October follow-up call was made by Summit.

41. On December 7, 2007, Summit filed an action against Walthers Oil, among others, in the United States District Court, District of Utah (the "Walthers Oil Action"), for amounts owing under the Walthers Financing Agreements. In connection with its filing of the Walthers Oil Action, Summit successfully obtained a preliminary injunction on January 2, 2008, that instructed Walthers Oil to pay Summit "all collections and proceeds of Accounts of Walthers Oil and Walthers Inc. and all other payments and proceeds, including cash and checks, from the sale or other disposition of inventory of Walthers Oil and Walthers Inc., which are in the possession or under the control of any of the Enjoined Parties."

42. Summit received four separate payments out of Walthers Oil's checking account with the description "to Summit per prelim. injunction," including $45,531.05, $14,342.35, $1,079.91, and $2,762.39.

43. Summit has charged back to Walthers Oil all the invoices submitted from Kathy's.

44. On December 18, 2007, Summit contacted Kathy's and spoke to Jeanie, who advised Summit that Kathy's never owed Walthers Oil money.

45. On December 18, 2007, Kathy's advised Summit that Kathy's had a $25,768 credit balance with Walthers Oil.

46. In December 2007, Kathy's discontinued purchasing fuel from Walthers Oil and instead began purchasing fuel from Fouser Energy. In connection with its transition from Walthers Oil to Fouser Energy, Kathy's contacted PCS and requested that PCS redirect credit card sales proceeds from the Walthers Oil account to a Fouser Energy account. Kathy's was told that because the agreement relating to the PCS equipment used by Kathy's was between Walthers Oil and PCS, PCS could not redirect Kathy's payments from the Walthers Oil account.

47. In support of the allegation in its Counterclaim that Summit improperly converted money belonging to Kathy's, Kathy's stated that it had "some bank records from Walthers Oil recently that shows that Summit took money out of the account that my credit card money went into."

48. The "bank records" relied upon by Kathy's consists of a one page of what appeared to be at least a 30 page bank statement for the Walthers Oil checking account.

49. With respect to the Walthers Oil account, proceeds from other Walthers Oil customers were deposited into the account.

50. The Walthers Oil account, held at Central National Bank, account number 605000727, into which Kathy's proceeds were deposited, was Walthers Oil's primary checking account, through which it

processed deposits and made payments to numerous individuals and parties, including Kathy's and Summit.

51. The single page from Walthers Oil's bank statement shows four separate ACH electronic payments made by Walthers Oil to Summit, between January 8, 2008 and January 14, 2008, totaling $63,715.70.  As indicated by the notations on the record, the four payments identified on the statement document that the payments were made by Walthers Oil in response to the Preliminary Injunction obtained by Summit against Walthers Oil, identified above.

52. Summit's claim is limited to amounts that post-date the NOA.

## Conclusions of Law

1. Unless displaced by the particular provisions of the uniform commercial code, the principles of law and equity, supplement its provisions.  Kan. Stat. Ann. § 84-1-103(b).

2. Kan. Stat. Ann. § 84-9-406(a) states as follows:

   **Discharge of account debtor; effect of notification.** Subject to subsections (b) through (i), an account debtor on an account, chattel paper, or a payment intangible may discharge the account debtor's obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge the account debtor's obligation by paying the assignee and may not discharge the obligation by paying the assignor.

3. Under Kan. Stat. Ann. § 84-9-102(A)(2), "account" includes a right to payment of a monetary obligation, whether or not earned by performance, "for property that has been or is to be sold."

4. "Account debtor" means a person obligated on an account, chattel paper, or general intangible." Kan. Stat. Ann. § 84-9-102(A)(3).

5. An account debtor who doubts the assignment may request proof of the assignment.  Kan. Stat. Ann. § 84-9-406(c).

6. Pursuant to the terms of the Walthers Financing Agreements between Walthers Oil and Summit, Summit was assigned all of the accounts of Walthers Oil, which included all of Kathy's accounts.

7. After receiving the NOA on July 30, 2007, Kathy's was obligated to pay Summit the amounts due and owing on the accounts it had with Walthers Oil. Kan. Stat. Ann. § 84-9-406(a) ("After receipt of the notification, the account debtor may discharge the account debtor's obligation by paying the assignee and may not discharge the obligation by paying the assignor.").

8. Under Kansas law, an assignee can gain no greater interest than the assignor. *Commerce Bank, N.A. v. Chrysler Realty Corp.*, 244 F.3d 777, 783−84 (10th Cir. 2001) (discussing the principle of *nemo dat qui non habet* in Kansas).

9. A right to payment is not created when an account is prepaid. *See, e.g., Cissell v. First Nat'l Bank of Cincinnati*, 476 F. Supp. 474, 493(S.D. Ohio 1979) (explaining that because the contract was prepaid, a "right to payment" never came into existence).

10. Based on the record before the court, Kathy's did not incur a monetary obligation to Walthers Oil for fuel that had been or was to be delivered because Kathy's prepaid Walthers Oil for the fuel through the use of the PCS transactions.

11. Because Kathy's prepaid Walthers Oil for the fuel through the use of the PCS transactions Walthers did not have a right to payment for the delivered fuel—Kathy's had already paid Walthers for the fuel.

12. Walthers could only assign to Summit the interest that it had in Kathy's accounts.

13. When Walthers Oil submitted the accounts to Summit, they were not accounts receivable— Walthers Oil had already been paid for the fuel. *See, e.g., id.* at 493 (noting that the "right to payment" did not exist when the contract was prepaid, and thus, the "accounts receivable" never arose).

14. Because there was no right to payment of a monetary obligation, Kathy's was not an "account debtor," as defined by Kan. Stat. Ann. § 84-9-102(A)(3).

15. Based on the record before it, the court finds Kathy's is not liable to Summit on the accounts submitted to Summit by Walthers Oil.

16. "Conversion is the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights." *Bomhoff v. Nelnet Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005).

17. Kathy's has failed to establish that Summit improperly received and retained amounts from Walthers Oil that were inadvertently paid to Walthers Oil. The record does not establish that the ACH electronic payments made by Walthers Oil to Summit, between January 8, 2008 and January 14, 2008, totaling $63,715.70, were made with monies that belonged to Kathy's.

18. Kathy's claim for conversion cannot be sustained on the record before the court and fails as a matter of law.

19. In reaching this conclusion, the court has considered the parties' stipulations, weighed the evidence and the credibility of the testimony of the witnesses—observing the manner and consistency of the witnesses' testimony—and reviewed the applicable law.

**IT IS THEREFORE ORDERED** that judgment shall be entered for Kathy's General Store, Inc. and against Summit Financial Resources, L.P. on Summit's claims.

**IT IS FURTHER ORDERED** that judgment shall be entered for Summit Financial Resources, L.P. and against Kathy's General Store, Inc. on Kathy's counterclaim.

Dated this 5th day of May 2010, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**